UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Edward Lee Elmore, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| City of Greenwood, County of Greenwood, | ) | |
| the Estate of Police Chief John Young in his | ) | |
| *official* and *individual* capacities, James S. | ) | **COMPLAINT** |
| Coursey in his *individual* capacity, the Estate | ) | (JURY TRIAL DEMANDED) |
| of Perry Dickenson in his *individual* | ) | |
| capacity, Alvin R. Johnson in his *individual* | ) | Case No.: |
| capacity, Gary Vanlerberghe in his | ) | |
| *individual* capacity, John T. Owen in his | ) | |
| *individual* capacity, Thomas W. Henderson, | ) | |
| Jr. in his *individual* capacity, William Earl | ) | |
| Wells in his *individual* capacity, Frank Dan | ) | |
| DeFreese in his *individual* capacity, Ira Byrd | ) | |
| Parnell, Jr. in his *individual* capacity, John | ) | |
| C. Barron in his *individual* capacity, the | ) | |
| Estate of William T. Jones in his *individual* | ) | |
| capacity, W. Townes Jones in his *individual* | ) | |
| capacity, Selma Thorne Jones in her | ) | |
| *individual* capacity, Donald John Zelenka in | ) | |
| his *individual* capacity, Jerry W. Peace in his | ) | |
| *individual* capacity, the Estate of Arlie P. | ) | |
| Capps in his *individual* capacity, Dr. Sandra | ) | |
| Conradi, and John and Jane Does 1-10, in | ) | |
| their official and individual capacities, | ) | |
| | ) | |
| *Defendants.* | | |

Plaintiff Edward Lee Elmore, by and through his attorneys, Janet T. Butcher, Jenny A.

Horne, and Alan W. Guffy, submits the following complaint against Defendants City of

Greenwood, County of Greenwood, the Estate of Police Chief John Young, James S. Coursey, the

1

Estate of Perry Dickenson, Alvin R. Johnson, Gary Vanlerberghe, John T. Owen, Thomas W. Henderson, William Earl Wells, Frank Dan DeFreese, Ira Byrd Parnell, Jr., John C. Barron, the Estate of William T. Jones, W. Townes Jones, Selma Thorne Jones, the Estate of Arlie Capps, Donald John Zelenka, Jerry W. Peace, Sandra Conradi, and John and Jane Does 1-10 (Defendants).

## NATURE OF THE ACTION

This is an action for damages and redress for certain illegal and unconstitutional actions taken by the State of South Carolina and its agencies named herein that led to the false arrest and unlawful conviction of Edward Lee Elmore and his sentence of death.   Their actions include fabrication of evidence, failure to disclose exculpatory evidence, the provision of false testimony to the Court, and conspiracy to convict an innocent man of the crimes of murder, burglary, and rape.  These actions were taken in violation of the Constitution of the United States of America, particularly the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, and Plaintiff brings this action for relief pursuant to 42 U.S.C. § 1983.  Plaintiff also brings certain causes of action pursuant to the common law of South Carolina.

## INTRODUCTION

1.  Edward Lee Elmore (Elmore) was imprisoned for over thirty years – twenty-eight of them on South Carolina's death row – because he was wrongfully convicted of a capital murder that he did not commit.   Despite his conviction, Mr. Elmore consistently maintained his innocence throughout those thirty years of imprisonment.   Ultimately, he was successful in petitioning the Fourth Circuit Court of Appeals for a writ of habeas corpus in 2011 on the ground that his trial defense failed to investigate highly suspicious forensic evidence supplied (1) by the City of

Greenwood, (2) by various agencies of the State of South Carolina, and (3) by a number of individuals employed by those entities.

2.  Following the grant of habeas corpus, Mr. Elmore was purposefully held in prison for another four months due to the Attorney General's concerted, deliberate, and willful desire to keep him incarcerated at all costs.  Elmore had no choice but to enter an *Alford* plea while maintaining his innocence.  He then received his immediate release from prison.

3.  The South Carolina Department of Corrections released him with no means of support and nothing in the way of practical training.  He was jailed and/or imprisoned from January 20, 1982 until March 2, 2012 after three trials, two post-conviction relief (PCR) hearings, four appeals to the South Carolina Supreme Court, and two appeals to the United States Supreme Court.

4.  Edward Lee Elmore's thirty-year ordeal could and should have been avoided.   His false conviction resulted from the concerted efforts of all defendants: individual veteran law enforcement officers of the South Carolina Law Enforcement Division (SLED), the City of Greenwood (City), city police officers, Greenwood County (County), and prosecutors from the Eighth Judicial Circuit Solicitor's Office and the South Carolina Attorney General's Office (AG), all of whom acted under color of law and acted pursuant to official policy, practice, or custom.

5.  With a desire to strengthen their extremely weak and/or nonexistent case of capital murder, these Defendants conspired to and, in fact, fabricated inculpatory evidence, ignored clear leads inconsistent with the prosecutions' theories, withheld material impeachment information, misled a grand jury, and offered fabricated evidence at trial in complete disregard of the integrity and respect owed not only to the criminal justice system but also to MR. Elmore, all with a purpose to ensure his wrongful arrest, trial, conviction, and punishment by death.

6.  Edward Lee Elmore is a black man with an IQ of 70.  Upon information and belief, his race and IQ played a substantial part in the Defendants' targeting of him as the scapegoat for Dorothy Edwards' murder in January of 1982.

7.  As a direct result of the Defendants' intentional, willful, wanton, reckless, deliberately indifferent, and bad-faith acts and omissions, Elmore sustained injuries and damages including but not limited to the following:  personal injuries, physical injuries, pain and suffering, severe mental anguish, emotional distress, loss of income, infliction of physical illness, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions from all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, family relations, reading, television, travel, enjoyment, and expression of every type.

8.  In addition to seeking compensation for Mr. Elmore's thirty years of pretrial and post-conviction custody on death row, this action seeks to redress the unlawful official policies, practices and customs that led Defendants to violate his constitutional rights as guaranteed by the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, the Constitution of the State of South Carolina, and the laws of the State of South Carolina.

JURISDICTION

9.  Federal jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, federal question jurisdiction.  Supplemental jurisdiction over the state law claims is brought pursuant to 28 U.S.C. § 1367.

## PARTIES

10. Plaintiff Edward Lee Elmore is an individual who, at all times pertinent to this complaint, resided in South Carolina in the County of Abbeville and in South Carolina's various prisons located predominantly in Richland County after his criminal convictions.

11. Defendant City of Greenwood (City) is a municipal entity organized under the laws of the State of South Carolina.

12. Defendant Greenwood County (County) is a municipal entity organized under the laws of the State of South Carolina.

13. Defendant John Young is a deceased individual who resided in South Carolina at all times pertinent to this complaint and whose estate is liable in this lawsuit. He is named in his official capacity as the final policymaker for the City of Greenwood with respect to policing and law enforcement investigations, as well as in his individual capacity for acts taken under color of law and within the scope of his employment.

14. Defendant James S. Coursey (Coursey) is an individual who resided in South Carolina at all times pertinent to this complaint. As a member of the Greenwood Police Department, he was an investigator for the Edwards' homicide and he participated in the Elmore trials. Coursey is named in his individual capacity for acts taken under color of law within the scope of his employment.

15. Defendant Perry Dickenson (Dickenson) is a deceased individual who resided in South Carolina at all times pertinent to this complaint and whose estate is liable in this lawsuit. As a member of the Greenwood Police Department, he was an investigator for the Edwards' homicide. Dickenson is named in his individual capacity for acts taken under color of law within the scope

5

of his employment.

16. Defendant Alvin R. Johnson (Johnson) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. As a member of the Greenwood Police Department, he was an investigator for Edwards' homicide. Johnson is named in his individual capacity for acts taken under color of law and within the scope of his employment.

17. Defendant Gary Vanlerberghe (Vanlerberghe) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. A member of the Greenwood Police Department, he was also an investigator for Edwards' homicide and participated in the trials of Edward Lee Elmore. Johnson is named in his individual capacity for acts taken under color of law and within the scope of his employment.

18. Defendant John T. Owen (Owen) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. As a member of the Greenwood Police Department, he was an investigator for Edwards' homicide. Johnson is named in his individual capacity for acts taken under color of law and within the scope of his employment.

19. Defendant Arlie Capps (Capps) is a deceased individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint and whose estate is liable in this matter. As an employee of the Greenwood County Sheriff's Department and the County of Greenwood, Mr. Capps was active in the interrogation and holding of Mr. Elmore. Capps is named in his individual capacity for actions taken under color of law and within the scope of his employment.

20. Defendant Thomas W. Henderson, Jr. (Henderson) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. As a member of the

6

South Carolina Law Enforcement Division, he was very active in the Elmore investigation. Henderson is named in his individual capacity for acts taken under color of law and within the scope of his employment.

21. Defendant William Earl Wells (Wells) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. As a SLED employee, he was very active in the Elmore investigations and trials. Wells is named in his individual capacity for acts taken under color of law and within the scope of his employment.

22. Defendant Frank Dan DeFreese (DeFreese) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. As a SLED employee, he was very active in the Elmore investigations and trials. DeFreese is named in his individual capacity for acts taken under color of law and within the scope of his employment.

23. Defendant Ira Byrd Parnell, Jr. (Parnell) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. As a SLED employee, he was very active in the Elmore investigations and trials. Parnell is named in his individual capacity for acts taken under color of law and within the scope of his employment.

24. Defendant John C. Barron (Barron) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. As a SLED employee, he was very active in the Elmore investigations and trials. Barron is named in his individual capacity for acts taken under color of law and within the scope of his employment.

25. Defendant W. Townes Jones (W.T. Jones) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. At all times relevant to this Complaint, he was a South Carolina Solicitor and active in the Elmore investigations and

prosecutions. Defendant W. Townes Jones is named in his individual capacity for actions taken under color of law and within the scope of his employment in his investigative capacity, and for administrative or ministerial acts and omissions.

26. Defendant Selma Thorne Jones (Selma Jones) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. At all times relevant to this Complaint, she was a South Carolina Solicitor and active in the Elmore investigations and prosecutions. Defendant Selma Jones is named in her individual capacity for actions taken under color of law and within the scope of his employment in his investigative capacity, and for administrative or ministerial acts and omissions.

27. Defendant William T. Jones is a deceased individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint and whose estate is liable in this matter. At all times relevant to this Complaint, he was a South Carolina Solicitor and active in the Elmore investigations and prosecutions. Defendant William T. Jones is named in his individual capacity for actions taken under color of law and within the scope of his employment in his investigative capacity, and for administrative or ministerial acts and omissions.

28. Defendant Jerry W. Peace (Peace) is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint. At all times relevant to this complaint he was a South Carolina Solicitor and active in the prosecution and delayed release of Mr. Edward Lee Elmore. Defendant Peace is named in his individual capacity for actions taken under color of law and within the scope of his employment in his investigative capacity, and for administrative or ministerial acts and omissions.

29. Defendant Donald John Zelenka (Zelenka) is an individual who, upon information and

8

belief, resided in South Carolina at all times pertinent to this complaint.  At all times relevant to this Complaint, he was an Assistant Deputy Attorney General for the State of South Carolina and active in the Elmore trials and post-conviction proceedings.  Zelenka is named in his individual capacity for actions taken under color of law and within the scope of his employment in his investigative capacity, and for administrative or ministerial acts and omissions.

30. Defendant Dr. Sandra Conradi is an individual who, upon information and belief, resided in South Carolina at all times pertinent to this complaint.  At all times relevant to this Complaint, she was a forensic pathologist for the State of South Carolina and the Medical University of South Carolina (MUSC) and active in the Elmore investigations and trials.  Dr. Conradi is named in her individual capacity for acts taken under color of law and within the scope of her employment.

31. Defendants John and Jane Does 1 through 10 are as-yet unidentified individuals and supervisors who, in their official and individual capacities, were personally involved in the investigations, arrest, and/or prosecutions of Edward Lee Elmore.

32. At all times herein, in committing the acts and omissions herein alleged, each of the defendants was acting within the scope of his or her employment and under color of law.

33. SLED, the South Carolina Attorney General's Office, the Medical University of South Carolina, the Greenwood County Sheriff's Department, and the Solicitor's Office of the Eighth Judicial Circuit are not named as defendants in this action to the extent that they are state agencies shielded from liability in this federal court by the Eleventh Amendment.  To that extent, they are the equivalent of "unindicted co-conspirators" who conspired with the defendants and whose eleventh amendment protections do not justify their conduct, which is incidental to establishing liability against the remaining co-conspirators.

JURY TRIAL DEMAND

34. Edward Lee Elmore hereby demands a trial by jury on all issues so triable.

FACTS

35. On Monday, January 18, 1982, Dorothy Ely Edwards (Edwards) was found murdered in her Greenwood, South Carolina home.

36. Edward Lee Elmore (Elmore) was arrested, prosecuted, convicted, and sentenced to death for her capital murder. He did not commit the crime. In 1982 he was, and he now is, innocent.

37. The homicide investigations were led and conducted by various officers of the Greenwood Police Department and the South Carolina Law Enforcement Division who are named in this Complaint.

38. Probable cause for Edward Lee Elmore's arrest was based solely on a single fingerprint lifted from the crime-scene. By the time of his trial, police officers for the City of Greenwood, working in tandem with agents from the South Carolina Law Enforcement Division and prosecutors from the Eighth Judicial Circuit Solicitor's Office had ample evidence refuting their initial impression that Elmore was the killer. Rather than seeking the administration of justice and continuing to investigate the evidence linked to the actual killer, the agencies and the individuals named in this complaint conspired to convict Edward Lee Elmore, then intentionally fabricated evidence against Elmore, and also withheld exculpatory evidence from his defense attorneys in furtherance of that conspiracy.

*The Crime Scene*

39. Edwards' body was discovered in her closet by her neighbor, James Holloway (Holloway).

10

40. Upon information and belief, Holloway routinely went to Edwards' home for cocktails, and it was widely suspected across town that Holloway and Edwards were involved in an affair.

41. Upon information and belief, on Sunday, January 17, 1982, Holloway went to Edwards' home.  While there he most probably murdered Edwards and attempted to mislead investigators and cover-up his crime by planting evidence, concealing his involvement, and masking the scene to make an organized and premeditated murder appear unorganized.

42. Upon information and belief, Holloway most probably modified the crime scene by:

    a.  Moving Edwards' from the bedroom floor into her closet;

    b.  Penetrating Edwards with a pair of bottle tongs to make it appear as if she had been raped;

    c.  Cutting Edwards with a serrated cake spatula to make it appear as though she were stabbed to death;

    d.  Setting her coffee pot to 6:00 so as to make the murder appear as if it occurred the night of Saturday, January 16;

    e.  Setting out the TV guide to indicate the murder happened on the night of Saturday, January 16;

    f.  Placing a suspected murder weapon (a pair of bottle-tongs) half-exposed in a kitchen drawer to draw attention to it, having wiped clean all fingerprints from it;

    g.  Leaving the serrated cake spatula on Edwards' chest of drawers amidst her family photographs, having wiped clean all prints from it;

    h.  Turning on the television;

    i.  Setting Edwards' alarm clock for 7:00 a.m. and leaving it on;

j. Causing general havoc throughout the house to make it appear as if a struggle had taken place, and;

k. Other means that Plaintiff expects to identify through discovery.

*Greenwood Police Department Investigation*

43. On Monday, January 18, 1982, Holloway called the Greenwood Police Department (GPD) and informed them that he had discovered Edwards' body.

44. Officers John Owen and Alvin Cook (Cook) of the Greenwood Police Department were the first officers to respond to the scene.

45. Sergeant Alvin Johnson of the Greenwood Police Department arrived shortly thereafter and took charge of the investigation and of the officers present.

46. Sergeant Johnson performed the initial interview of Holloway.  Upon information and belief, Holloway proceeded to lead the police through the home and to explain the crime scene to them, and Holloway made sure that the police discovered (and knew the significance) of planted evidence such as the TV Guide and the coffee maker.

47. Holloway also pointed out to police that Edwards' Aigner clutch purse was missing.

48. During the walkthrough, police found a bloody footprint on the dining room carpet pointed outward as if someone were walking away from the bedroom.

49. Sergeant Owen had earlier found a footprint outside the home leading into the kitchen.

50. In the kitchen, police found an empty sherry bottle and a recently-washed coffee mug.

51. The police dusted the sherry bottle for fingerprints.  The results of this fingerprint dusting have never been revealed.

52. The police also found a large pool of blood soaked into the carpet of Edwards' bedroom

floor, blood smeared on the wall beside the closet, and Edwards' body inside the bedroom closet.

53. After discovering the body, the police called Coroner Odell Duvall.  Shortly thereafter, Sergeant Johnson's superior, Captain Jim Coursey (GPD), arrived at the scene.

54. Recognizing the seriousness of the crime, Coursey alerted SLED, which sent Frank Dan DeFreese and Ira Byrd Parnell, Jr. as their first responders.

*SLED Investigation*

55. SLED Agents DeFreese and Parnell arrived at the crime scene and began their investigation.

56. As part of their investigation, Parnell and DeFreese—working in conjunction with the Greenwood Police Department—dusted the home for fingerprints and took photographs of the crime scene.

57. SLED agent DeFreese discovered a single fingerprint that matched Edward Lee Elmore outside the Edwards' home at the back door.

58. The officers also discovered a checkbook that indicated that Edwards had paid Elmore $43 on December 30, 1981.  Holloway informed the investigators that Mr. Elmore had recently done work for Mrs. Edwards.

59. Coursey rejected help from Charley Webber (Webber), the resident SLED agent in Greenwood despite the fact that Webber was responding to a request by Greenwood Police Chief John Young (Young).

60. Coursey accepted help from Thomas W. Henderson, Jr., a SLED agent who was not assigned to Greenwood but who had grown up as a neighbor of Edwards and Holloway.  Almost immediately, Henderson was firmly convinced of Elmore's guilt.  Upon information and belief,

Henderson was instrumental in orchestrating the conspiracy to convict Edward Lee Elmore.

*Gross Failures of the Investigators*

61. Throughout their investigation, officers placed an inordinate amount of trust in James Holloway, going so far as to base burglary and robbery charges solely on his account of certain alleged missing items (the clutch and a .32-caliber pistol).

62. Upon information and belief, Holloway was never considered a suspect in the murder of Edwards, despite Holloway's having been the first to discover her body and to walk through the crime scene and despite indications that Edwards had to have known her attacker including the following:

      a.  The fact that Edwards would have seen her assailant through the glass-paned door prior to opening the door;

      b.  The fact that Edwards had let her assailant into her home while dressed in a night gown and without undergarments; and,

      c.  The fact that the evidence of a struggle in the kitchen was obviously staged.

63. In addition, upon information and belief, Coursey was personally on notice of Holloway's alleged affair with Edwards. He never pursued this lead or investigated it further.

64. Likewise, no other law enforcement officer from SLED or the Greenwood Police Department involved in the investigation of Edwards' murder investigated the alleged affair between Holloway and Edwards, despite its notoriety in the community and the obvious motive it gave Holloway to attack his lover.

65. Instead, Coursey and Johnson, in conjunction with SLED and the Greenwood County Police Department, gave specific permission to Holloway to wipe clean Edwards' home less than

twenty-four hours into the investigation, destroying an unknown amount of evidence that would have exculpated Edward Lee Elmore and incriminated James Holloway.

66. Two days later, on Wednesday, Chief Young announced that the police considered the case closed and "no other arrests expected."

*Lack of Probable Cause*

67. Coursey sought a warrant to arrest Elmore and submitted to the judge an affidavit that stated, "The deceased body of Dorothy E. Edwards was found at her home at 209 Melrose Terrace, Greenwood, South Carolina, on January 18, 1982, with multiple stab wounds and indicia of her being the victim of rape.  A fingerprint of Edward Lee Elmore was found at this residence."

68. This warrant request omitted mention of all other evidence at the crime scene, including the bloody footprints, any other fingerprints recovered from the crime scene, and all other evidence that indicated a perpetrator other than Elmore was involved or cast doubt on the implication of Edward Lee Elmore in the crime.

69. The warrant request also intentionally omitted the fact that Edward Elmore had a valid reason to have been at Edwards' home in the thirty days prior to the murder.

70. Upon information and belief, these omissions were intentionally done to mislead the magistrate judge, Charles E. Henderson, Jr., into issuing a warrant despite law enforcement's knowledge that they did not have sufficient probable cause to arrest Elmore.

71. When this issue was brought to the attention of the trial judge, Solicitor William T. Jones invented additional evidence that never existed—specifically, that "Negroid" hair had been found on Edwards' body—in an effort to avoid a dismissal.  This was a blatant lie.

*Unconstitutional Interrogation*

15

72. Upon information and belief, following Elmore's arrest, the City of Greenwood through Captain Coursey, Sergeant Johnson, and Tom Hendesron violated Elmore's eighth amendment rights.

73. The officers interrogated Elmore without allowing him to sleep and forced him to undergo numerous, lengthy interrogations in an effort to break his spirit.

### a. Officer Coursey Tore 50+ Pubic Hairs From Elmore

74. Upon information and belief, Officer Coursey intentionally, maliciously, and wantonly inflicted unnecessary pain on Elmore by tearing over fifty pubic hairs from his groin with his bare hands.  In doing so, Coursey also grossly invaded Elmore's privacy.

75. Upon information and belief, Officer Perry Dickenson was present and assisted in interrogating Elmore.  He intentionally aided Officer Coursey in depriving Elmore of his federally protected rights with full knowledge of his misconduct.

76. Although these hairs were purportedly taken for "testing," no more than a dozen hairs were necessary to adequately perform a hair comparison and there was no need to rip them from Elmore's groin.

### *Misleading a Grand Jury*

77. Prosecutors and law enforcement sought a grand jury indictment before prosecuting Elmore.

78. Prosecutor William T. Jones purposefully failed to provide the grand jury with a fair and accurate description of the facts and evidence of the murder of Edwards.  Instead, he focused on the gruesomeness of the crime.

79. Upon information and belief, W.T. Jones intentionally misled the grand jury into believing

that the evidence against Edward Lee Elmore was stronger than it was with the singular objective of quickly securing an indictment against an innocent man.

80. Upon information and belief, the Greenwood grand juries generally approved W.T. Jones's theories, regardless of what the evidence suggested.

*Fabricated Evidence*

81. After Elmore's arrest, the Greenwood police and SLED agents systematically searched the homes and belongings of Elmore and his family for evidence linking Elmore to Edwards' murder. They found no forensic or physical evidence (such as Edwards' missing clutch purse) and, in fact, they found no evidence whatsoever.

82. Additionally, the evidence discovered vis-à-vis the autopsy of Edwards included unknown hairs discovered on her body and recovered fingerprints. None of this evidence "matched" Elmore's hairs or fingerprints, and the evidence further weakened the State's case against Elmore and implicated a third party assailant.

83. Upon information and belief, in an effort to bolster their case against Elmore, the Greenwood Police Department, the South Carolina Law Enforcement Division, the South Carolina Attorney General's office, and the individuals named in this complaint fabricated evidence to frame Edward Lee Elmore for the Edwards murder.

a. Pubic Hairs Found By Parnell on Bedspread

84. During Elmore's first trial, SLED agent Parnell testified that he had recovered forty-something pubic hairs from Mrs. Edwards' bedspread in an area of about thirty inches by eighteen inches.

85. Parnell further testified that these hairs were delivered to Earl Wells, the chief forensic

17

investigator at SLED, who tested the hairs and testified that they belonged to Elmore.

86. These hairs were introduced into evidence against Elmore in his first trial as "Exhibit 58."

87. These hairs were presented in a Ziploc bag that did not contain the usual SLED evidence label and had never been sealed, unlike the other evidence which was sealed.

88. Prosecutors W.T. Jones and Selma Jones represented that Edwards had ripped these hairs out of Elmore while he sexually assaulted her.

89. One juror admitted that this was the most persuasive evidence in the whole trial because he believed it concretely placed Elmore in Edwards' bedroom.

90. Upon information and belief, these hairs were the same hairs ripped from Elmore's pubic region by Captain Coursey. The hairs were then labeled as crime-scene evidence and falsely used to frame Elmore by SLED Agents Parnell, Defreese, and SLED's forensic expert, Earl Wells, with the full knowledge and consent of the other Defendants in this action.

91. This allegation is supported by circumstantial evidence including the following:

   a. Elmore showed no sign of injury to his pubic region when he was examined upon his arrest;

   b. The elderly Edwards would likely not have had the requisite strength to reach up and rip out such a quantity of pubic hair during a sexual assault;

   c. The prosecution's own witnesses could not agree on an exact number of hairs "recovered" from Edwards' bed, and these hairs, when added to the hairs tested from Elmore, were suspiciously similar to the number of hairs ripped from Elmore's pubis during his interrogation;

   d. The hairs were stored in an unsealed Ziploc baggie that did not have a SLED

18

evidence label like every other item of crime scene evidence recovered at the scene;

e. The bed was described in testimony by GPD Officer Alvin Johnson (Johnson) as having been turned down as if ready for bed, and not as the scene of a violent attack;

f. Other forensic evidence in the room, including the pool of blood on the carpet, indicated that the attack did not happen on the bed;

g. There was no mention of these hairs in any crime scene report or in any picture taken of the crime scene;

h. There was no mention of these hairs at the probable cause hearing;

i. There was no mention of these hairs at the preliminary hearing on March 25, 1982. At that hearing, GPD Officer Lee Moore was specifically asked if pubic or head hairs had been recovered from the crime scene and he responded, "No, sir, not to my knowledge;" and

j. There were no clear pictures of the bed or of the pubic hair "recovered" at the crime scene, despite the extensive photographs of other items of evidence recovered at the crime scene including photographs of the guest bedroom (and bed) where there was no evidence whatsoever of a struggle.

92. Elmore's blue jeans were taken from his mother's house and a SLED serologist, John Barron, determined that they had five spots of blood on them.

93. Pursuant to the chain of custody for this particular item of evidence, these jeans had been recovered by Detective Gary Vanlerberghe, taken to Earl Wells (SLED forensic expert), given to

19

John Barron (serologist), taken by SLED agent Tom Henderson who gave them to James Coursey, who gave them to Officer Perry Dickenson to return to Wells who returned them to Barron.

94. Agent Tom Henderson took those blue jeans, Elmore's shoes, and Elmore's coat from the lab on February 3, 1982 for an unrecorded amount of time, and returned them to Officer Coursey instead of Barron.

95. Barron did not finish testing the blood spots on the jeans until sixteen days after the return of evidence taken by Henderson.

96. Upon information and belief, at that point, Henderson had no affiliation with the Elmore investigation and had no right or authority to remove evidence from the investigators' chain of custody in an ongoing SLED investigation.

97. Upon information and belief, Henderson conspired with Coursey, Barron, Wells, and the other named Defendants to fabricate evidence against Elmore by and through the evidence taken by Henderson in February 1982.

98. Agent DeFreese, in his investigative report, fraudulently represented that six fingerprints were found and that they all either matched Edwards, Elmore, or were inconclusive.  In reality, the fingerprints revealed that a third party was present at Edwards home.

99. This third party's fingerprints were left on the back door and on the underside of her bathroom toilet-seat.

*Undisclosed Exculpatory Evidence*

100.       Upon information and belief, in an effort to bolster their case against Elmore, the Greenwood Police Department, Greenwood County, the Greenwood Sheriff's Department, the

South Carolina Law Enforcement Division, the Medical University of South Carolina, the South Carolina Attorney General's office, and the individuals named in this complaint concealed evidence from the Defense and from the Court to frame Elmore for Edwards' murder.

101.     Upon information and belief, Dr. Sandra Conradi concealed evidence from defense counsel including sixteen slides of Edwards' injuries and fifteen original photographs the police had taken of the crime scene, all of which were clearer and more helpful than those other pictures actually disclosed to defense counsel.

102.     Elmore's defense counsel at his 1995 PCR hearing specifically went to Dr. Conradi's office at MUSC and requested any and all undisclosed evidence.  Conradi insisted she had nothing.  Defense counsel were wholly unaware that any of these critical photographs and slides existed until Conradi later testified at the PCR hearing.

103.     This evidence was critical, objective evidence of the forensic investigation and contained exculpatory aspects that could have helped exonerate Edward Lee Elmore.

104.     Specifically, one of the missing photographs showed Edwards' body's placement relative to a boot-print that was positioned so as to indicate it was carefully placed, suggesting a level of premeditation inconsistent with the State's case against Elmore and Elmore's own mental abilities.

105.     Another photograph showed that there was no blood on the wood strip between the closet and the bedroom carpet, indicating that Edwards' body had been placed in the closet post-mortem.

106.     Upon information and belief, this evidence was known to the prosecutors in the Elmore case including William T. Jones and Selma Jones (Elmore Trials I and II), W. Townes

Jones (Elmore Trials III), and Donald John Zelenka (Elmore PCRs).   These prosecutors intentionally and knowingly refused to disclose this evidence to Elmore's counsel in violation of *Brady v. Maryland*, the American Bar Association's (ABA's) Criminal Justice standards, and the South Carolina Rules of Professional Conduct.

107.    Upon information and belief, the police found fingerprints on the empty sherry bottle discovered in Edwards' kitchen that belonged to Holloway.  (See supra ¶¶50-51).  SLED and Greenwood Police Department agents intentionally concealed their discovery.

108.    Upon information and belief, DeFreese, working in tandem and with the full knowledge and consent of the individuals named in this Complaint, discovered fingerprints at the crime scene which he subsequently identified as belonging to an unknown third party on the toilet lid of Edwards' bedroom's bathroom, and on the outside back door to Edwards' home.

109.    Rather than disclosing these exculpatory fingerprints to the defense, prosecutors in the Elmore trials, including William T. Jones and Selma Jones (Elmore Trials I and II), W. Townes Jones (Elmore Trial III), and Donald John Zelenka (Elmore PCRs), intentionally and knowingly refused to disclose this evidence in violation of *Brady v. Maryland*, the ABA's criminal justice standards, and the South Carolina Rules of Professional Conduct.

110.    This evidence was only uncovered when DeFreese was cornered on the stand and caught in a lie by Elmore's defense counsel at the 1995 PCR hearing.

111.    Upon information and belief, Coursey and Johnson, in conjunction with SLED and the Greenwood  Police Department, authorized Holloway to clean Edwards' home less than twenty-four hours into their investigation, destroying an unknown amount of evidence that would have further exculpated Edward Lee Elmore and very likely incriminated Holloway.

112.    SLED Agent Parnell, in conjunction with SLED and the Greenwood Police Department, intentionally declined to preserve Edwards' bedsheets to perform microbial or chemical testing despite alleging that Edwards' bed was the site of the sexual assault.  Upon information and belief, this was because the only forensic evidence the State could have recovered from that bed would have been detrimental to their trumped-up case against Edward Lee Elmore.

113.    Upon information and belief, SLED forensic investigator Earl Wells intentionally hid, in a file cabinet in his office,  "Item T," which contained hair and fiber samples recovered from Edwards' body during the autopsy performed by Sandra Conradi.  Wells hid "Item T" because upon examination of Item-T, it clearly contained Caucasian hairs which undermined the City of Greenwood and SLED's case against Edward Lee Elmore.

114.    Rather than disclosing these exculpatory hairs and fibers to the defense, prosecutors in the Elmore case including William T. Jones and Selma Jones (Elmore Trials I and II), W. Townes Jones (Elmore Trials III), and Donald John Zelenka (Elmore PCRs) intentionally and knowingly refused to disclose this evidence in violation of *Brady v. Maryland*, the ABA's criminal justice standards, and the South Carolina Rules of Professional Conduct.

115.    Upon information and belief, John Young and the Greenwood Police Department intentionally withheld exculpatory evidence in the police station, including a piece of bedroom carpet, a piece of gum found in Edwards' backyard, and the robe Edwards wore at the time of her murder.  These pieces of evidence each contained potential DNA evidence that could have exculpated Edward Lee Elmore.

116.    Rather than disclosing this exculpatory evidence to the defense, prosecutors in the

23

Elmore case including William T. Jones and Selma Jones (Elmore Trials I and II), W. Townes Jones (Elmore Trials III), and Donald John Zelenka (Elmore PCRs) intentionally and knowingly refused to disclose this evidence in violation of *Brady v. Maryland*, the ABA's criminal justice standards, and the South Carolina Rules of Professional Conduct.

*Suborning Perjury*

117.      During Elmore's initial trial in 1982, as well as during his second trial in 1984, inmate James Arthur Gilliam, Jr. (Gilliam) testified for the City of Greenwood against Edward Lee Elmore.

118.      Gilliam had a lengthy "rap sheet" of crimes including burglary, fraudulent-check charges, receiving stolen property, prison escape, disorderly conduct, resisting arrest, and assault and battery.

119.      Upon information and belief, Gilliam was approached by jail personnel and told "You help me out on the Elmore thing, and we'll look out for you."

120.      Upon information and belief, Defendant Arlie Capps, an employee of Greenwood County Sheriff's Department and the Greenwood County Detention Center, working on the behalf of William T. Jones and the co-conspirators named in this complaint, intentionally placed Gilliam in Elmore's cell just days before Elmore's trial in order to act as a State informant.

121.      Elmore was never Mirandized during his questioning by Gilliam, thereby violating his constitutional rights under the Fourth, Fifth, and Sixth amendments.

122.      Upon information and belief, Detective Gary Vanlerberghe, Sgt. Alvin Johnson, William T. Jones, and Selma Jones subsequently learned that Gilliam was "willing to talk" and they spent hours with him, fine-tuning a fraudulent story which they would then use against

Elmore.

123.      Upon information and belief, Gilliam could not possibly have invented the entirety of his testimony by himself without being coached by investigators and prosecutors who were intimately aware of the facts of the case.

124.      Just after Elmore's third trial, Gilliam recanted the entirety of his testimony and admitted, knowing full-well the penalty for perjury, that his statements made under oath during the first two trials were whole-cloth lies.

125.      Upon information and belief, William T. Jones and Selma Jones intentionally allowed, and, in fact, encouraged James Gilliam to testify falsely in the trials despite knowing that his testimony would be fraudulent, perjurous, and demeaning to the court as an institution of justice.

*False Testimony to the Court*

126.      Throughout Elmore's trials, multiple individuals lied or misrepresented facts when conveying them to the court, both to the juries and the judges.

127.      Prosecutors William T. Jones, William Townes Jones, and Selma Jones conspired, aided, and abetted in the submission of false testimony and made material misrepresentations to the courts of the State of South Carolina.

128.      In the first trial, William T. Jones and Selma Jones intentionally misrepresented to the trial court and the jury the number of informants who would testify that Edward Lee Elmore had confessed in court.

129.      At best this number was one, although in reality that witness (Gilliam) knowingly

and intentionally lied on the stand in an effort to bolster the prosecution's case. William T. Jones and Selma Jones falsely and knowingly represented that many such witnesses existed.

130.     William T. Jones represented to the court that "negroid hair" had been found on Edwards' body during Dr. Conradi's autopsy when, in fact, it never had been. The truth is that actual Caucasian hairs found on Dorothy Edwards' body during the autopsy tended to exculpate Elmore.

131.     Dr. Sandra Conradi misrepresented the medical facts in her testimony to corroborate the State's theory that Edwards had been murdered on Saturday night, despite the fact that medical evidence suggested that this was so remotely improbable that other experts suggested that there was less than a one in one hundred chance that her testimony was accurate.

132.     In reality, it was far more likely that Edwards was murdered on Sunday, January 17, 1982.

133.     Conradi also intentionally misrepresented the types of injuries suffered by Edwards to comport with the State's theory of the case.

134.     While under oath, SLED Agent DeFreese testified that he had uncovered six fingerprints and that SLED had only been able to positively identify Edwards and Elmore. This was a lie.

135.     In reality, the fingerprint analysis revealed that an unaccounted-for third party had left prints at the house both on the back door (where Elmore's print was found) and on the underside of the toilet lid in Edwards' bathroom.

136.     SLED Agent DeFreese, in collusion with the other Defendants named in this action, conspired to hide this evidence and lied under oath during Elmore's first trial to prevent

26

this evidence from being used to exculpate Elmore.

137.     While under oath, SLED Agent Parnell testified that he had recovered numerous hairs from the bed of Dorothy Edwards.  Upon information and belief, this was a lie.

138.     In reality, the hair was obtained by Officer Coursey from Elmore during his interrogation following soon after his arrest.  These hairs were then retroactively added to the non-hair evidence Greenwood Police and SLED agents found in Edwards' house.

139.     Earl Wells, the head of forensics at SLED, falsely testified that he had received the hairs with the body of Edwards at approximately 1:00-2:00 a.m. on January 19, 1982 and told the police to look for a "Negro" with reddish-brown hair.

140.     In reality, at that time, Edwards' body was in a sealed container at Self Memorial Hospital.  The hair evidence was not surrendered to Wells until 6:59 p.m. on January 19, 1982.

141.     None of the police reports, including an evidence report written by Deputy Coroner Grady Hill after Elmore's arrest, reference any pubic hairs found on Edwards' bed.

142.     This evidence was also omitted from the probable cause hearing, and a March 25 preliminary hearing in magistrate's court where Lieutenant Lee Moore was specifically asked about any pubic or head hairs found in the house.  Moore denied any knowledge of any such hairs being recovered at the crime scene.

143.     Earl Wells also falsely testified and maintained for sixteen years that he did not have "Item T" in his possession.   In reality, Item-T (which contained exculpatory hair evidence) was hidden in a file cabinet located in Wells' office itself.

144.     Wells perjured himself both by denying that he possessed Item-T and by asserting that "Negroid" hairs were found on Dorothy Edwards' body when, in fact, the hairs found on

Dorothy Edwards' body were Caucasian.

*Inadequate and Unconstitutional Municipal Policies*

145.     Upon information and belief, the City of Greenwood's established policies for police investigations caused Elmore's rights to be shockingly violated.

146.     Specifically, the City of Greenwood lacked any proper policy regarding the storage of evidence or the investigation of a crime scene.

147.     This lack of policy allowed, at best, continuing, widespread, and persistent errors to be made that led to the conviction and incarceration of Elmore for the majority of his life. Additionally, this failure to provide policy protections caused Mr. Elmore to be sentenced to death and very nearly ended his life.

148.     These unconscionable errors, among others, include the following:

   a.   Failure to preserve the chain of evidence;

   b.   Failure to adequately photograph the crime scene;

   c.   Failure to adequately dust the crime scene for fingerprints;

   d.   Failure to adequately catalog and preserve evidence;

   e.   Failure to adequately control evidence in the City's possession;

   f.   Failure to seal evidence bags or use proper labels on all bags;

   g.   Failure to fully investigate a crime scene;

   h.   Failure to preserve evidence at a crime scene during an investigation; and

   i.   Failure to pursue even the most obvious potential leads.

149.     These errors were all ratified by Police Chief John Young who, upon information and belief, was the chief policymaker for the City's Police Department during the time relevant to

this complaint.

150.     Furthermore, upon information and belief, the Police Chief was aware of and gave implied or express permission to the City's police officers to fabricate and conceal evidence.

*Prosecutors Fought Elmore's Release*

151.     After three trials and decades of appeals, on November 22, 2011, the Fourth Circuit Court of Appeals determined that Edward Lee Elmore's constitutional rights had been violated and that he was entitled to a new trial.

152.     Despite this decision, Elmore was kept imprisoned for another four months by the State of South Carolina, in blatant violation of the judgment of the Fourth Circuit Court of Appeals.

153.     Upon information and belief, the South Carolina Attorney General's Office, Donald John Zelenka, the Solicitor's Office of the Eighth Judicial Circuit, and Solicitor Jerry W. Peace conspired to delay Elmore's release for as long as possible by filing frivolous State and Federal motions and otherwise intentionally delaying Elmore's bond hearing.

154.     Upon information and belief, this process of delay was designed by Defendant to threaten Elmore and his attorneys, and place additional pressure on Elmore to accept a deal instead of trying his case a fourth time.

155.     Elmore withstood this pressure for four months after being declared a free man, despite having been exposed to a legal system that had lied, violated his constitutional rights, and deprived him of his liberty for over thirty years.

156.     For more than four months after the Fourth Circuit Court of Appeals declared that Mr. Elmore's trial was unconstitutional and granted his petition for habeas corpus relief, Mr.

Elmore still had never received a bond hearing.

157.    Due to the intentional delay tactics employed by the South Carolina Attorney General's office and the Solicitor's Office of the Eighth Judicial Circuit, Mr. Elmore ultimately agreed to an *Alford* plea, all the while maintaining his innocence, in order to secure his freedom, at last.

158.    Mr. Elmore accepted the Alford plea solely to put an end to his three decades of suffering.

159.    After more than thirty years, Elmore was finally released from custody on March 2, 2012.

**FOR A FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 Claim for Fourteenth Amendment**
**Substantive and Procedural Due Process Violations**
**Against Defendants Estate of John Young, James Coursey, Estate of Perry Dickenson, Alvin R. Johnson, Gary Vanlerberghe, John Owen, Thomas Henderson, William Earl Wells, Frank Dan DeFreese, Ira Byrd Parnell, Jr., John C. Barron, Estate of Arlie Capps, Estate of William T. Jones, W. Townes Jones, Selma Thorne Jones, Donald John Zelenka, Sandra Conradi, and John/Jane Doe Defendants 1-10**

160.    Plaintiff incorporates all of the foregoing as if set forth herein and further alleges as follows:

161.    The Defendants, acting in concert with one another, and aiding and abetting one another, attempted to bolster their case against Elmore, which consisted of a single fingerprint and check written to him, by unconstitutionally committing the following acts:

      a.    falsifying and misstating the results of a fingerprint analysis done at the crime scene to conceal exculpatory evidence that suggested a third party was present at Edwards' home prior to her murder;

      b.    lying to the court about the existence of exculpatory hair evidence and

intentionally hiding that evidence from the court and defense counsel for nearly two decades;

c.   intentionally suborning perjury from a prison snitch in order to bolster inadequate evidence;

d.   intentionally misleading the grand jury to indict Elmore on insufficient evidence;

e.   needlessly and painfully ripping over fifty pubic hairs from Elmore's groin in contravention of the Eighth Amendment and for the purpose of intentionally and deliberately framing Elmore;

f.   fraudulently marking samples of Elmore's pubic hairs as SLED crime-scene evidence in an effort to frame Edward Lee Elmore;

g.   falsely representing to the court on numerous occasions that Elmore's pubic hair had been found at the scene of the crime when evidence suggests that none of his hairs were ever found;

h.   falsely implying at trial that multiple individuals had heard and would testify that Elmore had confessed while confined and awaiting trial;

i.   failing to disclose other exculpatory evidence including evidence that potentially contained DNA evidence that could have been used to exonerate Elmore and photographic evidence harmful to the prosecutions' case-in-chief;

j.   failing to disclose photographs taken by law enforcement that showed the crime scene more clearly and that provided details that tended to exonerate Elmore;

k.   using unconstitutional interrogation tactics in an attempt to break Elmore and manipulate him into confessing to a crime he did not commit;

31

l.  intentionally planting serological evidence on Elmore's clothes to frame him, or intentionally and willfully turning a blind eye to the breaking of the chain of custody so as to allow an unauthorized third party to tamper with evidence;

m.  failing to take proper steps to seek probable cause and pursuing an indictment against Elmore when any reasonable officer would have known that the evidence was insufficient to establish probable cause and that pursuing that indictment would violate Elmore's constitutional rights;

n.  representing to the court that evidence did not exist when, in fact, evidence did exist (e.g. hair samples, fingerprints, and photographs) that required no exercise of prosecutorial discretion but was, instead, a ministerial or administrative act.

o.  likewise, representing to the court that evidence existed when, in fact, that evidence did not exist (e.g. other witnesses to Elmore's "confession" at the jail, falsely representing that hairs had been found on Edwards' body) and it required no exercise of prosecutorial discretion but was instead a ministerial or administrative act.

162.     All the undisclosed evidence was inconsistent with the prosecution's theory and tended to exculpate Elmore.  The prosecution team's failure to provide this evidence to Elmore's attorneys in any of his three trials violated Elmore's constitutional rights to a fair trial as well as to substantive due process of law.

163.     All of the foregoing acts and omissions were committed under color of law, and violated clearly established laws of which any reasonable official would have known.

164.     The actions of the Defendants named in this cause of action caused the deprivation

of Elmore's liberty without due process of law, in violation of the Fourteenth Amendment of the United States Constitution. The Defendants' actions also inflicted cruel and unusual punishment upon Elmore in violation of the Eighth Amendment of the United States Constitution.

165.     The actions of the defendants named in this cause of action interfered with Elmore's fundamental constitutional rights under the Fourth, Fifth, Sixth, and Eighth Amendments of the United States Constitution, as applied to the State of South Carolina vis-à-vis the Fourteenth Amendment.

166.     As a direct and proximate result of Defendants' deliberate, reckless, deliberately indifferent, and/or bad-faith acts and omissions, Edward Lee Elmore was deprived of his Fourteenth Amendment rights to (1) substantive due process, (2) a fair trial, and (3) procedural due process. He was wrongfully convicted, sentenced to death, and endured thirty years of imprisonment as well as all the physical, emotional and pecuniary injuries set forth above and below in the prayer for relief.

### FOR A SECOND CAUSE OF ACTION
**42 U.S.C. § 1983 Conspiracy to Violate Elmore's Fourteenth-Amendment Rights to Due Process and a Fair Trial**
**Against Defendants Estate of John Young, James Coursey, Alvin R. Johnson, Estate of Perry Dickenson, Gary Vanlerberghe, John Owen, Thomas Henderson, William Earl Wells, Frank Dan DeFreese, Ira Byrd Parnell, Jr., John C. Barron, Estate of William T. Jones, W. Townes Jones, Selma Thorne Jones, Donald John Zelenka, Sandra Conradi, Jerry W. Peace, Estate of Arlie Capps, and John/Jane Doe Defendants 1-10**

167.     Plaintiff incorporates all of the foregoing as if set forth herein and further alleges as follows:

168.     Upon information and belief, Defendants knowingly conspired, reached a mutual understanding, and acted in concert with one another to violate Elmore's Fourteenth Amendment

rights to substantive due process, to a fair trial, and loss of liberty without due process of law. In the alternative, Alvin R. Johnson, John Young, Gary Vanlerberghe, John T. Owen, John C. Barron, and Dr. Sandra Conradi joined the conspiracy by consciously and deliberately avoiding knowledge of constitutional violations that were committed by members of the investigative team, and/or they were willfully blind to such constitutional violations by James S. Coursey, Alvin R. Johnson, Thomas W. Henderson, William Earl Wells, Frank Dan DeFreese, Ira Byrd Parnell, Jr., William T. Jones, W. Townes Jones, Selma Thorne Jones, Jerry W. Peace, Donald John Zelanka, Arlie Capps, and the offices and agencies for which these individuals worked under color of state law.

169.    In furtherance of the conspiracy, Defendants each undertook overt acts, including without limitation:

    a.  James S. Coursey (GPD)

        i.   Allowed James Holloway to wipe clean Edwards' home shortly after the investigation had begun, forever destroying critical forensic evidence;

        ii.  Ripped hair from Elmore's groin which was subsequently used to frame him; and

        iii. Other overt acts alleged in this complaint.

    p.  Perry Dickenson (GPD)

        i.   Assisted James Coursey in the unlawful interrogation and collection of pubic hairs from Edward Lee Elmore;

        ii.  Partook in the interrogation with full knowledge of Coursey's illicit intentions to frame Elmore;

          iii.   Other overt acts alleged in this complaint.

b.   Alvin R. Johnson (GPD)

          i.   Allowed Holloway to wipe clean Edwards' home shortly after the investigation had begun, forever destroying forensic evidence;

          ii.   Worked with James Gilliam to craft fraudulent testimony;

          iii.   Assisted James Coursey in recovering Elmore's pubic hairs; and

          iv.   Other overt acts alleged in this complaint.

c.   Gary Vanlerberghe (GPD)

          i.   Searched Elmore's home and seized Elmore's coat and pants, among other personal belongings, to use as evidence against him in a sham trial; and

          ii.   Other overt acts alleged in this complaint.

d.   John T. Owen (GPD)

          i.   Discovered evidence at the Edwards' murder scene that was intentionally left undeveloped; and

          ii.   Other overt acts alleged in this complaint.

e.   Thomas W. Henderson (SLED)

          i.   Fabricated serological evidence and planted it on Elmore's clothing while it the clothing in the State's custody; and

          ii.   Other overt acts alleged in this complaint.

f.   William Earl Wells (SLED)

          i.   Hid exculpatory evidence in his office that he knew was detrimental to

the prosecutions' case against Elmore;

    ii.    Lied during trial testimony about the existence of "Item-T;"

    iii.    Lied to the Court by indicating that Elmore's hairs had been found on Edwards' body; and

    iv.    Other overt acts alleged in this complaint.

g.   Frank Dan DeFreese (SLED)

    i.    Falsely testified that the only fingerprints that SLED's investigation could salvage from the crime scene belonged to Elmore and Edwards;

    ii.    Upon information and belief, hid or destroyed the sherry bottle in Edwards' home which, upon information and belief, would have provided additional exculpatory fingerprints to Elmore's defense; and

    iii.    Other overt acts alleged in this complaint.

h.   Arlie Capps (Greenwood County / Greenwood County Sheriff's Department)

    i.    Conspiring with prosecutors and law enforcement to violate Elmore's constitutional rights by illegally manipulating him into providing inculpatory information to the police;

    ii.    Intentionally furthering this conspiracy by planting a jailhouse snitch in Elmore's cell without giving him his Miranda rights or otherwise protecting his rights;

    iii.    Other overt acts alleged in this complaint.

i.   Ira Byrd Parnell (SLED)

    i.    Allowed the cleaning of Edwards' bed sheets, thereby destroying

valuable microbial evidence that would have revealed that Elmore was not the killer;

    ii.    Worked in conjunction with Frank DeFreese to conceal fingerprint evidence;

    iii.    Perjured himself at trial when he testified that he recovered numerous hairs from Edwards' bed; and

    iv.    Other overt acts alleged in this complaint.

j.  John C. Barron (SLED)

    i.    Allowed Tom Henderson, a SLED agent not assigned to the Edwards' murder, to remove sensitive evidence from SLED's custody for an unknown period of time and for an unknown reason. Upon information and belief, that reason was to illegally plant serological evidence that would incriminate Elmore; and

    ii.    Other overt acts alleged in this complaint.

k.  W. Townes Jones (Eighth Judicial Circuit Solicitor's Office)

    i.    Intentionally aided and abetted the submission of false testimony before the court;

    ii.    Was knowing and complicit in all acts performed by his father, Solicitor William T. Jones, that resulted in Elmore's fraudulent conviction; and

    iii.    Other overt acts alleged in this complaint.

l.  Selma T. Jones (Eighth Judicial Circuit Solicitor's Office)

    i.    Was knowing and complicit in all acts performed by her father, Solicitor

William T. Jones;

    ii.    Encouraged submission of false testimony, the fabrication of evidence, and the cover-up of exculpatory evidence that led to Elmore's conviction; and

    iii.    Other overt acts alleged in this complaint.

m.  William T. Jones (Eighth Judicial Circuit Solicitor's Office)

    i.    Intentionally directed and encouraged the creation and submission of false evidence before the court in the trials of Edward Lee Elmore; the suppression of exculpatory evidence; and,

    ii.    Other overt acts alleged in this complaint.

n.  Jerry W. Peace (Eighth Judicial Circuit Solicitor's Office)

    iv.    Acted with knowledge and complicity to further the co-conspirators' plot to hold Mr. Elmore for months after his release was ordered by the Fourth Circuit upon granting his writ of habeas corpus;

    v.    Intentionally and deliberately delaying Mr. Elmore's release and bond hearing to further break his spirit so that he might accept a plea bargain;

    vi.    Other overt acts alleged in this complaint.

o.  Donald J. Zelenka (SC Attorney Generals' Office)

    i.    Acted with knowledge of the co-conspirators' actions and sought to perpetuate the conspiracy by hiding evidence and furthering the use of fabricated evidence in the trials of Edward L. Elmore;

    ii.    Conspired to delay Edward Elmore's release following the Fourth

Circuit's granting of his habeas petition in a plot to break his spirit and further trample Elmore's liberties; and

    iii.   Other overt acts alleged in this complaint.

p.  Sandra Conradi (Medical University of South Carolina)

    vii.   Acted with knowledge of the co-conspirators' actions and sought to perpetuate the conspiracy by concealing evidence and furthering the use of fabricated evidence in the trials of Edward L. Elmore;

    viii.   Other overt acts alleged in this complaint.

170.    The conspiracy was first undertaken while Defendants William T. Jones, Selma T. Jones, W. Townes Jones, Jerry W. Peace, and Donald Zelenka were acting in an investigative capacity, and later, in their capacity as officers of the court. These prosecutors are not named as defendants in this conspiracy to the extent that they undertook any overt acts while acting as advocates or exercising prosecutorial discretion. To that extent, they are the equivalent of "unindicted co-conspirators" who conspired with Defendants but whose immunity from liability for money damages does not justify their conduct, which is incidental to establishing liability against the remaining co-conspirators.

171.    Defendants' conspiracy directly and proximately deprived Elmore of his rights under the Fourteenth Amendment and caused his unfair trial, wrongful conviction, death sentence, thirty years of imprisonment, and all the physical, emotional and pecuniary injuries set forth above.

**FOR A THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 Claim for Failing to Establish a Constitutional Regime**
**of Training, Supervision and/or Discipline Regarding the Production of *Brady* Material**
**Against Defendant John/Jane Doe**

172.     Plaintiff incorporates all of the foregoing as if set forth herein and further alleges as follows:

173.     Unknown Defendant, John Doe, in his individual capacity as a supervisor at the Eighth Judicial Circuit Solicitor's Office and acting under color of law within the scope of his employment, failed to establish a constitutional regime of training, supervision, and/or discipline that would ensure prosecutors' compliance with the constitutional duty to disclose Brady material.

174.     As a direct and proximate result of Defendant John Doe's acts and omissions, Plaintiff Elmore was wrongly convicted, sentenced to death for a crime he did not commit, and suffered all of the physical, emotional and pecuniary damages set forth above.

**FOR A FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983 *Monell* Claim**
**Against the City of Greenwood / County of Greenwood**

175.     Plaintiff incorporates all of the foregoing as if set forth herein and further alleges as follows:

176.     The City of Greenwood and the Greenwood Police Department, by and through as yet unnamed policymakers, created and maintained a custom, policy, and/or practice of unreliable evidence identification, unreliable evidence storage, and unreliable investigative procedures and techniques that resulted in the injuries suffered by Elmore in this case.

177.     Upon information and belief, the methods of evidence identification and storage, and the investigative procedures utilized by the City of Greenwood and the Greenwood Police Department were contrary to the accepted methods used by law enforcement agencies and were

otherwise illegal and improper so as to, on their face, constitute unconstitutional municipal customs, practices, and/or procedures.

178.    Upon information and belief, as the police chief of the City of Greenwood at the time of Elmore's trial, Defendant John Young was the Town's final policymaker with respect to criminal investigations.

179.    Because he was the final policymaker, Young's deliberate and unconstitutional consent to his officers' fabrication of evidence and concealment of exculpatory evidence constitute policy decisions that had the City' stamp of approval.

180.    The County of Greenwood, by and through as yet unnamed policymakers, created and maintained a custom, policy, and/or practice of unreliable interrogations and unreliable investigative procedures and techniques that resulted in the injuries suffered by Elmore in this case.

181.    Upon information and belief, the methods of interrogation and the investigative procedures utilized by the County of Greenwood and the Greenwood County Sheriff's Department were contrary to the accepted methods used by law enforcement agencies and were otherwise illegal and improper so as to, on their face, constitute unconstitutional municipal customs, practices, and/or procedures.

182.    Upon information and belief, as the county manager of the Greenwood County at the time of Elmore's trial, Defendant John/Jane Doe, was the Town's final policymaker with respect to criminal investigations.

183.    As a direct result of the unconstitutional municipal policies of the City of Greenwood and the County of Greenwood and the deliberate and unconstitutional conduct ratified

by the City and County of Greenwood's policymakers, Elmore was wrongly convicted, sentenced to death, imprisoned for thirty years, and suffered all of the physical, emotional, and pecuniary damages set forth above and in the prayer for relief, below.

184.    Alternatively, upon information and belief, the omission of specific policies geared to regulate evidence intake and storage indirectly encouraged the Greenwood Police Officers, SLED agents, and other Defendants, named and unnamed in this complaint, to deliberately exploit those insufficient policies and violate Elmore's rights.

185.    Likewise, and alternatively, upon information and belief, the omission of specific policies geared to regulate interrogations and investigations indirectly encouraged Arlie Capps and personnel in the Greenwood County Detention Center to exploit those insufficient policies and violate Elmore's rights.

186.    Upon information and belief, the lack of adequate investigative policies, specifically regarding evidence storage and intake, in investigations of capital crimes made the misconduct that resulted in Edward Lee Elmore's injuries inevitable.

### FOR A FIFTH CAUSE OF ACTION
### CIVIL CONSPIRACY
**Against Defendants Estate of John Young, James Coursey, Estate of Perry Dickenson, Alvin R. Johnson, Gary Vanlerberghe, John Owen, Thomas Henderson, William Earl Wells, Frank Dan DeFreese, Ira Byrd Parnell, Jr., John C. Barron,   W. Townes Jones, Selma Thorne Jones, Donald John Zelenka, Sandra Conradi, Jerry W. Peace, Estate of William T. Jones, Estate of Arlie Capps, and John/Jane Doe Defendants 1-10**

187.    Plaintiff  incorporates all of the foregoing as if set forth herein and further alleges as follows:

188.    Defendants  Young,  Dickenson,  Coursey,  Johnson,  Vanlerberghe,  Owen, Henderson, Capps, Wells, DeFreese, Parnell, Barron, William T. Jones, Townes Jones, Selma

Jones, Zelenka, Peace, Conradi, and John/Jane Doe Defendants 1-10 mutually agreed to act unlawfully in connection with the investigation, prosecution, and imprisonment of Edward Lee Elmore.

189.     In support of this conspiracy, Defendants engaged in the overt acts set forth above in Cause of Action II, Paragraph 169 of this Complaint.

190.     This civil conspiracy was the direct and proximate cause of Elmore's unfair trial, wrongful conviction, death sentence, thirty years of imprisonment, and all of the past and ongoing physical, emotional, and pecuniary injuries set forth above.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Edward Lee Elmore prays that this Court grant the following relief:

A.  Enter judgment in his favor and against Defendants on all counts of the complaint;

B.  Award compensatory damages to Mr. Elmore and against the Defendants, jointly and severally, in an amount to be determined at trial;

C.  Award punitive damages to Mr. Elmore and against all Defendants except the Town of Greenwood, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar illicit conduct by Defendants and other officials in the future;

D.  Award to Mr. Elmore and against Defendants pre-judgment and post-judgment interest on all sums awarded him in this matter and, further, award Mr. Elmore recovery of his costs concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

E.  Grant Mr. Elmore all such other relief to which he may be entitled.

RESPECTFULLY submitted this the 26th day of June 2013.

JENNY HORNE LAW FIRM, LLC

s/ Janet T. Butcher
Janet T. Butcher
U.S. District Court #: 1629

s/ Jenny A. Horne
Jenny A. Horne
U.S. District Court #: 7048

s/ Alan W. Guffy
Alan W. Guffy
U.S. District Court #: 11633

Attorneys for Plaintiff
107 South Main Street
Summerville, SC 29483
Telephone:     843-873-1721
Facsimile:     843-875-4696